UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-07799 GAF (AJWx) | Date | May 15, 2014 |
|---|---|---|---|
| Title | Loratious Presley v. R. J. Reynolds Tobacco Company | | |

| Present: The Honorable | **GARY ALLEN FEESS** | | |
|---|---|---|---|
| Stephen Montes Kerr | None | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

**Proceedings:**       (In Chambers)

### STATEMENT OF INTENDED DECISION

   This is an employment case in which Plaintiff Loratious Presley ("Presley" or "Plaintiff"), an African-American employee of RJR, claims that he was wrongfully terminated on the basis of his race. Defendant R.J. Reynolds Tobacco Company ("RJR") contends that Presley was terminated for serious misconduct – falsifying a work report, lying to his supervisor regarding his work activities, and involving a customer in his misconduct. The case was tried to the Court on March 11 and 12, 2014.

   The following sets forth this Court's statement of its intended decision in this case. The document does not address every detail of the case, contains few citations to the record, and should not be construed as the Court's findings of fact and conclusions of law. Rather, it states the Court's intended resolution of the case and provides direction to the prevailing party, who will prepare revised findings of fact and conclusions of law that are consistent with this document. In short, this document should be viewed as a decision with guidance. In that regard, although the Court anticipates that the proposed findings and conclusions will be substantially more detailed than this document, will likely cover matters not expressly addressed in this document, and will contain citations to the record, the Court expects that the proposed findings and conclusions will be consistent with this statement of decision.

   To summarize, the Court concludes that judgment should be entered in favor of RJR. Not only did Presley fail to prove that his termination was the result of discriminatory animus, the weight of the evidence established that RJR terminated Presley for misconduct. Judgment will be entered for RJR.

**I.**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-07799 GAF (AJWx) | Date | May 15, 2014 |
|---|---|---|---|
| Title | Loratious Presley v. R. J. Reynolds Tobacco Company | | |

# FACTS

**A. BACKGROUND**

### 1. The Territory Manager Position

Defendant RJR, like most manufacturers of consumer products, sells its products in geographical territories where sales to retail outlets are overseen by a Territory Manager. The Territory Manager reports to a Senior Division Manager who typically oversees eight different territories. Approximately eight Senior Division Managers, in turn, report to a Senior Director of Trade Marketing.

Through the Territory Manager, RJR maintains contact with its customers. The Territory Manager bears sole responsibility for increasing the sale of RJR products within his territory. Accordingly, the Territory Manager is responsible for making periodic sales calls on each retail outlet that carries RJR branded products in its inventory. On any given day, the Territory Manager, who normally performs his duties alone, determines in his discretion which of his accounts he will call on. During visits, the Territory Manager's duties include the following, among others: (1) the inspection of customer premises to insure that RJR brands are visibly displayed in proper quantities at the correct prices; (2) a determination that the proper amount of RJR products are in stock; (3) an assessment of the location of brand displays; (4) a determination that brand promotions have been properly implemented; and (5) an evaluation of the placement of point of sale materials.

Trial witnesses described the Territory Manager as the "eyes and ears" of RJR within the territory. Mr. Roman, a high level RJR manager, testified at trial that, because the Territory Manager is RJR's "CEO" in his area, the company delegates substantial responsibility to him and relies heavily on his honesty and integrity.

### 2. The Connect Reporting System

Once the Territory Manager has completed a call on an account, RJR policies mandate that he report that call through RJR's Connect Reporting ("Connect") computer system. Connect allows RJR to track all manner of contract compliance on the part of its customers. Accordingly, when the Territory Manager reports through Connect, he ordinarily records his observations relating to pricing, product placement, signage, and product availability for each location he has visited. Because this information is of great importance to RJR's marketing

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-07799 GAF (AJWx) | Date | May 15, 2014 |
|---|---|---|---|
| Title | Loratious Presley v. R. J. Reynolds Tobacco Company | | |

department, utilization of RJR's Connect Reporting system is an essential aspect of the Territory Manager's job performance.

To insure that the Territory Manager's observations are as accurate as humanly possible, RJR policy recommends that observations be entered into the Connect system during the Territory Manager's visit. All sales call activity data entered into the system is time-stamped in local time – in Plaintiff's case, Pacific time.

Presley was trained in the use of the Connect system in approximately 2003-2004, and by 2010 he was very familiar with the system. Presley does not dispute the importance that Connect data be as accurate as possible.

### 3. *Authority of Territory Managers*

If a customer is not in compliance with its obligations to RJR with respect to signage, pricing, product placement and the like, a Territory Manager has a number of possible actions he can take. These include: giving the customer an oral or written warning; taking away money paid for placing a particular display in a specified location; reducing discounts offered to the customer; and cancelling the contract. In short, the Territory Manager wields substantial power in the area he services.

### 4. *"Work With" Events*

Although Territory Managers normally perform their duties alone, the Senior Division Manager will, from time to time, announce that he will meet the Territory Manager in the field to review the calls the Territory Manager has made. RJR refers to these events as a "work with." This case involves issues of Presley's alleged misconduct in connection with a "work with" with his District Manager, Andrew Bradigan.

### 5. *Loratious Presley*

RJR hired Loratious Presley ("Presley" or "Plaintiff") in 1992 as a Territory Manager,[1] which was an at-will position within the company. (Ex. 43.) Presley worked in the Southern California region which, in 2010, was managed by Bill Roth, the Senior Director, Trade Marketing. Presley's territory was substantial – between 200 and 300 retail outlets – all within

---

[1] The title was different in 1992, but the duties were unchanged over the entire period of employment.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-07799 GAF (AJWx) | Date | May 15, 2014 |
|---|---|---|---|
| Title | Loratious Presley v. R. J. Reynolds Tobacco Company | | |

Los Angeles County. Presley had worked his most recent territory over the two years prior to his termination. During that period, Presley typically worked in the field during the usual 8:00 a.m. to 5:00 p.m. work day. However, on some occasions his workday varied from that schedule to allow more opportunity to interact with his customers. To insure that his visits gave him a true picture of his customer's compliance with its obligations to RJR, Presley did not have a set schedule for visiting his customers.

At the time of Presley's termination, his Senior Division Manager was Andrew Bradigan. Bradigan had worked as a Territory Manager starting in 2008, and was promoted to Division Manager in June 2010. As the Territory Managers' supervisor, the Senior Division Manager is expected to periodically conduct a "work with" with each Territory Manager. A "work with" is self-defining – the Senior Division Manager and the Territory Manager go into the workplace together to create a training and evaluation opportunity. The Senior Division Manager has a chance to observe his Territory Manager's practices both to help him improve and, if the Territory Manager has developed practices or techniques that might be useful company-wide, to acquire that information and pass it along to others.

By all accounts, Presley performed well as an RJR employee. Plaintiff had no history of performance problems, and received consistently favorable performance reviews. He was well-regarded by Mr. Roth who had worked with Mr. Presley from 1999 to 2010.[2]

**B. COMPANY DISCIPLINARY POLICIES**

Applicable RJR policies and practices are set forth in its "Trade Marketing Employee Handbook," which is provided to each employee when hired. (Ex. 8.) The handbook contains general information regarding an employee's duties and responsibilities, a detailed discussion of workplace practices, and cross-references the company's code of conduct. (Id.) The handbook includes a description of RJR's corrective action policy. (Id, at 75 et seq.) The corrective action policy also contains a section that lists "reasons for immediate termination." (Id. at 78.) Those reasons include:

> E. Gross misrepresentation of information as it relates to business practices.

---

[2] This testimony is not surprising. Mr. Presley made a very good impression during the trial. He appeared knowledgeable about his job duties and his customer base, presented a professional demeanor, and was very well-spoken. The Court accepts that Presley performed well and was generally well-regarded among RJR marketing managers prior to the events giving rise to this case.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-07799 GAF (AJWx) | Date | May 15, 2014 |
|---|---|---|---|
| Title | Loratious Presley v. R. J. Reynolds Tobacco Company | | |

F.  Material falsification of work, reports or information.
G.  Reporting retail calls contacted that the employee either did not physically contact or did not perform any of their assigned job accountabilities.

(Id.)  The record reflects that Presley received a copy of the handbook on November 8, 2006. (Ex. 21, Bates 643-44.)

Mr. Watson, who is himself African-American and the Director of Workplace Practices, described RJR's approach to the enforcement of these policies to insure consistent application in all cases.  For example, he explained that he becomes involved in every termination to insure consistency and uniform application of the company's policies and practices.  He noted that Division Managers do not have unilateral authority to terminate an employee; every termination goes through Workplace Practices review.  Mr. Watson testified that the company consistently terminates employees who provide false or misleading information to their supervisors, or in a report.  Where his review establishes that the employee has in fact engaged in acts of dishonesty, which historically represents about 10 to 15 cases a year, the employee is terminated.

**C.  THE EVENTS OF AUGUST 20, 2010**

On August 20, 2010, sometime between 11:00 a.m and 1:00 p.m. Bradigan attemtped to reach Presley to arrange a "work with."  After Bradigan contacted him, Presley entered data in Connect Reporting for visits to customers he purportedly made earlier that day.  Bradigan and Presley describe radically different versions of those events, which requires the Court to resolve the credibility conflict raised by these differing versions of the key events.  For the reasons that follow, the Court concludes that the evidence presented at trial thoroughly impeached Presley's version of the key events.  The Court first sets forth what it finds to have happened on August 20, 2010, and thereafter addresses the reasons for its credibility determination.

*1.  What Occurred*

At roughly mid-day on August 20, 2010, Bradigan attempted to contact Presley to arrange a "work with" during the afternoon.  Presley, who had not been in the field that morning and now concedes that fact, responded and learned that Bradigan wanted to accompany him in the field that afternoon.  This conversation occurred shortly before 12:30 p.m.  After Bradigan contacted Presley, Presley entered data into Connect that reflected that he had visited customers earlier that day.  Specifically, between 12:41 p.m. and 12:56 p.m., Presley entered data for seven visits that were purportedly conducted on the morning of August 20.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-07799 GAF (AJWx) | Date | May 15, 2014 |
|---|---|---|---|
| Title | Loratious Presley v. R. J. Reynolds Tobacco Company | | |

When Bradigan and Presley met, they reviewed the data entered into Connect, and Bradigan asked Plaintiff to revisit the locations that Presley had entered into Connect as having been visited earlier that day. Presley did not disclose to Bradigan that he had made no visits earlier that day nor did he indicate that he had visited those stores the night before. Instead, Presley and Bradigan proceeded to the locations that Presley had supposedly visited without any indication from Presley that the visits had not taken place. Bradigan became suspicious of the veracity of the Connect data because, during the first two visits, Bradigan observed that the conditions of the retail locations, notably product availability, did not appear to match the conditions that Presley reported observing earlier that day.

Bradigan and Presley then visited Rite Aid store 05423, another store that Presley reported having visited that morning. Shortly after they arrived at the store, Bradigan and Presley were separated; Bradigan noted again that the condition of the store differed significantly from the information contained in the Connect report. Bradigan approached the store manager, Eddy Cuellar, and asked whether Presley had in fact been in the store earlier that day. Cuellar advised Bradigan that, although he (Cuellar) had been in the store the entire day, he had not seen Presley. Cuellar then reported that Presley had asked him (Cuellar) to lie to Bradigan – to tell Bradigan that Presley had been in the store earlier if Bradigan asked. Bradigan then viewed surveillance video and determined that it corroborated Cuellar and showed that Presley had not been at the store that day.[3]

Presley at first acknowledged that he had not visited these locations, but then changed his story to claim that he had visited them the prior evening. Presley asserted that, although he entered his report regarding the visits on August 20, 2010, he actually visited the stores on August 19, 2010 but could not enter the data because the computer system was not working.

### 2. *Presley's Credibility*

Presley contends that, on the evening of August 19, 2010, he visited the stores that are reflected in the Connect system as having been visited on August 20, 2010. He contends that these visits were entered on August 20 because of computer problems on August 19 that precluded him from entering the data. He denies claiming that he visited these stores on August 20, and he generally attacks the credibility of both Bradigan and Cuellar.

---

[3] Bradigan visited a second customer on the Connect list – Griff Liquor – and determined through a review of video surveillance data that Presley had not visited Griff Liquor that morning.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-07799 GAF (AJWx) | Date | May 15, 2014 |
|---|---|---|---|
| Title | Loratious Presley v. R. J. Reynolds Tobacco Company | | |

The Court has carefully considered Plaintiff's arguments in support of his version of events and finds that they are not credible. The Court notes the following:

(1) <u>Cuellar's Credibility</u>. Cuellar is a third party witness who has no stake in the outcome of this case, and who the Court found particularly credible.

Cuellar promptly notified Bradigan on August 20, 2010, that Presley had asked him to lie about having visited earlier that day. He has never wavered on that crucial point. Nevertheless, Presley argued that Cuellar was motivated to make up lies about Presley. That argument finds no support in the evidentiary record. On the contrary, the record indicates that Cuellar had no personal relationship with either Presley or Bradigan, and that, but for being asked to lie for Presley, he harbored no ill will toward him. Likewise, the record showed no special relationship between Cuellar, on the one hand, and RJR and its managers, on the other. There was simply no evidence of any motive on his part to make a false claim to RJR about statements made by Presley. Likewise, there is no evidence from which one could conclude that the business relationship between Cuellar's Rite Aid store and RJR would motivate Cuellar to favor RJR in this litigation. For example, the record contains no evidence regarding the volume of business done with RJR either in absolute terms or as a percentage of the sales volume of Store 05423.[4] In short, there is nothing in the record to suggest that Cuellar had any motive to lie.

(2) <u>The Connect Report</u>. Plaintiff contends that he entered data from August 19 into the Connect report on August 20 because the computer system was not working on August 19. The report, Exhibit 42, indicates otherwise. Exhibit 42 reflects that, starting at around 8:30 p.m. on August 19, a time that is consistent with his practice of entering data

---

[4] To be sure, Presley attempted to impeach Cuellar by pointing out minor testimonial discrepancies that are common when a witness testifies four years after the event. For example, Cuellar could not recall exactly when he first signed a declaration setting forth his knowledge regarding the events in this case. After lengthy and largely pointless examination, his confusion appeared to stem from the fact that he had spoken with RJR representatives shortly after the event, but did not execute a declaration until many months later. Another example: Cuellar could not recall how long Bradigan and Presley were in his store even though in deposition some years earlier he had testified that they were there for five to ten minutes. A third example: Cuellar had forgotten that Bradigan reviewed surveillance video when he testified in his deposition but recalled it later when it was mentioned. In the Court's experience, these sorts of discrepancies are common and do not indicate dishonesty or fabrication. On the critical issues – that Presley did not come into the store on the morning of August 20 and that Presley asked him to cover up that fact with Bradigan – there was no material change in Cuellar's testimony.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-07799 GAF (AJWx) | Date | May 15, 2014 |
|---|---|---|---|
| Title | Loratious Presley v. R. J. Reynolds Tobacco Company | | |

in the Connect system, Presley entered data regarding visits to 12 different customers who he visited that day. Whether or not the system was working earlier on the 19th is therefore beside the point. Later that evening when Presley was entering data from his customer calls, the system was up and running. Thus, had he visited stores on the evening of the 19th, he could have entered data regarding those calls into the Connect system.

(3) <u>Timing</u> <u>of</u> <u>Entries</u>. The timing of the entries tends to show that they were made for the purpose of misleading Bradigan into believing that Presley had been in the field earlier on August 20. The record shows that Bradigan called Presley just before 12:30 p.m. to announce that he wanted to do a "work with" with Presley that afternoon. *After* that telephone call, Presley began to enter data into the Connect system at 12:41 p.m. and finished his seventh entry at 12:56 p.m., not long before he met Bradigan. Moreover, the Court reviewed the entries on the Connect report and, of the hundreds of line items recording visits to customers, the Court could find only one entry at a similar time of the day. Every other report reviewed by the Court was entered in late afternoon at the earliest, and most were entered on or after 6:00 p.m. Thus, the timing stands out in part because it was completely inconsistent with Presley's practice and in part because the evidence gives rise to a strong inference that the data was entered in response to Bradigan's telephone call.

(4) <u>Content</u> <u>of</u> <u>Entries</u>. Bradigan immediately observed that, at each of the first three stops, the condition of the store did not reflect the condition reported in Connect, particularly with respect to product availability. It appears that this discrepancy motivated him to question Cuellar about Presley's purported visit. Presley argues that conditions change quickly in the stores and testified, without giving a single specific, that he had seen conditions in stores change shortly after his visit. (Docket No. 91, at 16.) This, he said, was very common. (<u>Id</u>.) First, the Court notes that the testimony is extremely general and does not include a single, specific example. Second, despite Presley's testimony that he has observed such changes over short periods of time, the Court again surveyed Exhibit 42 to find specific examples where Presley visited the same customer at different times on one day, or on consecutive days. The Court could find no examples where that occurred. Thus, in the absence of specific testimony from Presley, in the absence of entries in Exhibit 42 showing an immediate re-visit, and in view of the extremely brief interval between the purported initial visit on August 20 (or even August 19) and the second visit with Bradigan, the discrepancy between the Connect report and the conditions observed at the customer premises undermines the credibility of Presley's claim to have recently visited these retail customers.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-07799 GAF (AJWx) | Date | May 15, 2014 |
|---|---|---|---|
| Title | Loratious Presley v. R. J. Reynolds Tobacco Company | | |

(5) <u>Working At Home.</u>  Presley now concedes that he worked at home on the morning of August 20, 2010, but the only reasonable interpretation of the overall record is that Presley did not so advise Bradigan.  Had he immediately informed Bradigan that he had been dealing with administrative matters earlier that day, the events of the afternoon would have proceeded in an entirely different way.  Thus, the only plausible reading of the record as a whole supports a conclusion that Presley did not inform Bradigan that he had not visited customers that morning until Bradigan confronted him on the subject.

*3.  Summary*

To summarize, the Court finds that:

(1) Presley did not visit any customers on August 20, 2010;

(2) Presley entered data into the Connect Reporting system to create the false impression that he did visit customers earlier on August 20, 2010;

(3) Presley's data included false statements regarding observations made at the customer locations because he had not visited those locations prior to the entry of the data;

(4) When Presley met Bradigan he did not advise him that he had worked at home earlier that day and falsely advised that he had conducted customer visits;

(5) Presley involved a customer, Eddy Cuellar, the store manager at Rite Aid Store 05423, in his effort to deceive Bradigan by asking Cuellar to tell Bradigan that Presley had visited the store that morning when, in fact, Presley had conducted no such visit.

**D. THE TERMINATION**

Bradigan reported the events of August 20 to his manager based on what appeared to be an alarming breach of company policy: (1) Presley's falsification of data entered into the Connect system; (2) Presley's making of false statements to Bradigan indicating that he had made visits to customers on August 20, 2010; and (3) Presley's involvement of an RJR customer by asking Eddy Cuellar to lie to corroborate other false statements made by Presley to Bradigan, The issue of discipline was discussed within the Trade Marketing chain of command and with high level managers in Work Place Practices.  Eventually, a decision was made that Presley had engaged in serious misconduct, that the misconduct subjected Presley to potential termination, and that termination of employment was appropriate.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-07799 GAF (AJWx) | Date | May 15, 2014 |
|---|---|---|---|
| Title | Loratious Presley v. R. J. Reynolds Tobacco Company | | |

# II.
# DISCUSSION

The legal principles that apply in this case are well-established and not particularly complicated. The Court will only briefly discuss them and their application in this case.

As the record indicates, Presley was an at-will employee with RJR. California law provides that "[a]n at-will employment may be ended by either party 'at any time without cause,' for any or no reason, and subject to no procedure except the statutory requirement of notice." Guz v. Bechtel Nat. Inc., 24 Cal.4th 317, 335 (2000) citing, e.g., Foley v. Interactive Data Corp., 47 Cal.3d 654, 680 (1988); Gantt v. Sentry Insurance, 1 Cal.4th 1083, 1094 (1992). There is, however, a public policy exception to the at-will employment doctrine. Green v. Ralee Engineering Co., 19 Cal.4th 66, 71 (1998); Gantt, 1 Cal.4th at 1089-90. That doctrine precludes any employee from being terminated where race is at least a substantial motivating factor.

Presley claims that his termination was racially motivated and brings two claims that essentially raise the same issue: (1) termination in violation of the California Fair Housing and Employment Act ("FEHA"), Cal. Govt. Code § 12940(a) and (2) wrongful termination in violation of public policy – racial discrimination. Both claims require proof that RJR was Presley's employer, that Presley was an employee and that Presley suffered an adverse employment action that caused him harm. (See CACI, Civil Jury Instructions Nos. 2500 and 2430; see also Ninth Circuit Manual of Model Jury Instructions (Civil), Instruction Nos. 10.1A – 10.1C.) There is no real dispute that RJR terminated Presley's employment. Likewise, there is no dispute that he was a member of a protected class. The only element in issue, which is common to both claims, is whether Presley's race was "a substantial motivating reason for the discharge."

Assuming for purposes of discussion that Presley has presented enough evidence to establish a prima facie case of discrimination, the record demonstrates that RJR has shown a legitimate, non-discriminatory reason for terminating Presley – that he engaged in the kind of misconduct that its manual warns is cause for immediate termination. The Court must therefore review the record to determine whether there is specific and substantial evidence that would tend to show that the reason given was pretextual. Aragon v. Republic Silver State Disposal Inc., 292 F.3d 654, 658-59 (9th Cir. 2002); Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1331 (9th Cir. 1998). On that issue, and indeed on the ultimate question of whether the termination was motivated by racial animus, Plaintiff bears the ultimate burden. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981); Aragon, 292 F.3d at 659.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-07799 GAF (AJWx) | Date | May 15, 2014 |
|---|---|---|---|
| Title | Loratious Presley v. R. J. Reynolds Tobacco Company | | |

Here Plaintiff has not met his burden. The Court notes the following:

(1) Plaintiff presented no direct evidence of racial bias, such as a racially derogatory remark or racial epithets, directed toward him or any other employee by any decision maker or anyone else at RJR. Compare Godwin, 150 F.3d at 1222 ("don't want to have to deal with another female"); Cordova v. State Farm Ins. Companies, 124 F.3d 1145, 1149 (9th Cir. 1997) (references to "dumb Mexican").

(2) Plaintiff argued that his termination was the result of racial stereotyping but offered no evidence of any statements, comments, actions or policies that even hinted at racial stereotyping. Compare Lindahl v. Air France, 930 F.2d 1434, 1439 (9th Cir. 1991) (references to female candidate tending to get nervous, easily upset, and lose control as contrasted with male candidates). Instead of presenting evidence of stereotyping to support his discrimination claim, Presley inferred stereotyping from the termination itself as a basis for finding in his favor. That turns the issue of discrimination on its head. To reiterate, Presley cannot argue discrimination from the fact of termination; he must prove that the termination was the result of racial animus with evidence, independent of the termination, that racial animus was a motivating factor for the termination.

(3) Plaintiff offers no evidence of any disparate treatment of non-minorities who engaged in similar misconduct. See Moran v. Selig, 447 F.3d 748, 755 (9th Cir. 2006) (employees must be similarly situated in all material respects to support disparate treatment discrimination claim); see also Aragon, 292 F.3d at 660.[5] Defendant, on the other hand, presented the testimony of Mr. Watson, the Director of Workplace Practices, who explained that he becomes involved in every termination to insure consistency and uniform application of the company's policies and practices. He noted that Division Managers do not have unilateral authority to terminate an employee and that every termination goes through Workplace Practices review. Watson testified that the company consistently terminates employees who provide false or misleading information to their supervisors, or in a report.

---

[5] Plaintiff suggested at trial that he made no effort to present such evidence because the Court barred it in a pre-trial ruling. This is a grossly misleading argument. The only pre-trial ruling that could be remotely related to this issue was raised by Defendant who moved in limine to exclude evidence of other racial discrimination claims brought against RJR. Plaintiff did not oppose that motion. Given the lack of any opposition, the Court granted the motion. The Court inferred that Plaintiff failed to oppose the motion because he had no such evidence to offer.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-07799 GAF (AJWx) | Date | May 15, 2014 |
|---|---|---|---|
| Title | Loratious Presley v. R. J. Reynolds Tobacco Company | | |

(4) Plaintiff presented no evidence that RJR gave inconsistent reasons for his termination and that the ultimate reason given was a subsequent fabrication. Godwin, 150 F.3d at 1222 (shifting explanations may support an inference of discriminatory animus); Lindahl, 930 F.2d at 1438 (same). On the contrary, the record indicates that employee misconduct was the basis for the inquiry into Presley's conduct and his ultimate termination.

Despite this dearth of evidence, Plaintiff insists that RJR's investigation into his alleged misconduct was inadequate and pretextual to conceal an unlawful motive and achieve an illegal result. However, the evidence established that RJR proceeded in this case as it had in any number of other similar cases. Bradigan referred the matter to his boss, and his boss directed him to bring in RJR's "Workplace Practices" to discuss the matter and determine how it should be addressed. It is true that aspects of Presley's story were not investigated – particularly his claim that he visited the locations in issue on August 19 – but RJR reasonably concluded that, once it was clear that Presley had lied about several important matters, there was nothing to be gained by expanding the investigation. This was not an unreasonable conclusion and not one that the Court should second-guess.

Moreover, Presley fails to explain why RJR, after 18 years, would want to terminate him in the absence of actual misconduct. Presley was well known to managers involved in the termination decision and was recognized as a good, long-term employee who had their respect. No one held any animus toward Presley, racial or otherwise. But once he was caught in serious acts of dishonesty, RJR concluded that he could no longer be trusted. Given the responsibilities of a Territory Manager, RJR reasonably concluded that it could not tolerate having someone in that position whose integrity was in doubt. As Watson testified, RJR receives 10 to 15 reported instances of employee dishonesty each year. Once RJR confirms acts of dishonesty, the employees who were found to have engaged in that kind of misconduct were consistently terminated. In such circumstances, length of service and prior performance are not taken into account because they are not considered relevant to the question of the employee's integrity. Presley was not treated any differently than any other similarly situated RJR employees.

### III.
### CONCLUSION

For these reasons, the Court concludes that judgment should be entered in favor of RJR. RJR is to submit amended proposed findings of fact and conclusions of law consistent with this statement along with a proposed judgment. The findings should contain citations to the evidentiary record, and should be lodged in a format that will permit the Court to review and edit

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 12-07799 GAF (AJWx) | Date | May 15, 2014 |
|---|---|---|---|
| Title | Loratious Presley v. R. J. Reynolds Tobacco Company | | |

the document. The amended findings of fact and conclusions of law and proposed judgment are to be filed with the Court no later than close of business on Friday, May 23, 2014.

**IT IS SO ORDERED.**