1   Cindi L. Ritchey (State Bar No. 216899)
    Liat L. Yamini (State Bar No. 251238)
2   critchey@jonesday.com
    JONES DAY
3   555 South Flower Street
    Fiftieth Floor
4   Los Angeles, CA  90071.2300
    Telephone:   +1.213.489.3939
5   Facsimile:    +1.213.243.2539

6   Aaron L. Agenbroad (State Bar No. 242613)
    alagenbroad@jonesday.com
7   JONES DAY
    555 California Street, 26th Floor
8   San Francisco, CA 94104
    Telephone:  (415) 626-3939
9   Facsimile:   (415) 875-5700

10  Attorneys for Defendant
    R.J. REYNOLDS TOBACCO COMPANY
11

12              UNITED STATES DISTRICT COURT

13             CENTRAL DISTRICT OF CALIFORNIA

14

15  LORATIOUS PRESLEY,                | Case No. 2:12-cv-07799 GAF (AJW)
16              Plaintiff,            |
                                      | Assigned for all purposes to
17       v.                           | Hon. Gary Allen Feess
18  R.J. REYNOLDS TOBACCO             | **DEFENDANT R.J. REYNOLDS**
19  COMPANY, and DOES 1-25,           | **TOBACCO COMPANY'S**
    inclusive,                        | **AMENDED FINDINGS OF FACT**
                                      | **AND CONCLUSIONS OF LAW**
20              Defendant.            |
21                                    | Trial Date:     March 11, 2014

22

23

24

25

26

27

28

TO THE COURT AND TO PLAINTIFF AND HIS ATTORNEYS OF RECORD:

Consistent with the Court's Statement of Intended Decision of May 15, 2014, Defendant R.J. Reynolds Tobacco Company ("Defendant" or "RJRT") hereby submits the following Amended [Proposed] Findings of Fact and Conclusions of Law:

## I.      FINDINGS OF FACT

### A.      Background

#### 1.      The Territory Manager Position

1.      Defendant RJRT, like most manufacturers of consumer products, sells its products in geographical territories where sales to retail outlets are overseen by a Territory Manager.  Tr. 107:21-107:24. [1]

2.      The Territory Manager reports to a Senior Division Manager who typically oversees eight different territories.  Tr. 258:6-8.

3.      Approximately eight Senior Division Managers, in turn, report to a Senior Director of Trade Marketing. Tr. 258:1-2.

4.      Through the Territory Manager, RJRT maintains contact with its customers.  Tr. 246:1-3.

5.      The Territory Manager bears sole responsibility for increasing the sale of RJRT products within his/her territory.  Tr. 74:5-20.

6.      Accordingly, the Territory Manager is responsible for making periodic sales calls on each retail outlet that carries RJRT branded products in its inventory. Tr. 108:23-25.

/ / /

_____

[1]  All "Tr." citations are to the "Reporter's Daily Transcript of Proceedings," Volumes 1-3, Day 1 of Court Trial, March 11, 2014, in the above-captioned matter. Volume 1 is comprised of pages 1 - 68 (Docket No. 87).  Volume 2 is comprised of pages 69 - 197 (Docket No. 91).  Volume 3 is comprised of pages 199 - 266 (Docket No. 88).

7.     On any given day, the Territory Manager, who normally performs his duties alone, determines in his discretion which of his accounts he will call on.  Tr. 75:6; 108:16-18; Transcript of Deposition of Andrew Bradigan[2] ("Bradigan Tr.") at 68:17.

8.     During visits, the Territory Managers' duties include the following, amongst others: (1) the inspection of customer premises to ensure that RJRT brands are visibly displayed in proper quantities at the correct prices; (2) a determination that the proper amount of RJRT products are in stock; (3) an assessment of the location of brand displays; (4) a determination that brand promotions have been properly implemented; and (5) an evaluation of the placement of point of sale materials.  Tr. 83:11-25.

9.     Trial witnesses described the Territory Manager as the "eyes and ears" of RJRT within the territory.  Tr. 83:3-4, 90:7-10.

10.     Mr. Eli Roman ("Roman"), a high level RJRT manager, testified at trial that, because the Territory Manager is RJRT's "CEO" in his area, the company delegates substantial responsibility to the Territory Manager and relies heavily on his honesty and integrity.  Tr. 212:22-23.

## 2.     The Connect Reporting System

11.     Once the Territory Manager has completed a call on an account, RJRT policies mandate that he report that call through RJRT's Connect Reporting ("Connect") computer system.  Tr. 143:4-5.

12.     There are a lot of things Territory Managers can do on Connect, including updating contact information for a retailer, updating tax ID information,

---

[2]  Mr. Andrew Bradigan ("Bradigan") was unavailable for trial.  The parties designated portions of Bradigan's deposition testimony to be included as part of the trial record, in lieu of live testimony.  Docket Nos. 44 and 57, and attachments thereto.  RJRT filed counter-designations and objections to Presley's designations.  Docket No. 70.  The Court sustained RJRT's objections to certain excerpts and overruled others.  Docket No. 76.  RJRT cites to only those portions of Bradigan's deposition that have been admitted as part of the trial record in this case.

DEFENDANT'S <u>AMENDED</u> [PROPOSED]
FINDINGS OF FACT AND CONCLUSIONS OF
LAW

and reporting retail conditions.  Tr. 82:8-25.

13.    Connect allows RJRT to track all manner of contract compliance on the part of its customers.  *Id.*

14.    RJRT has the ability to penalize stores that are not selling its products properly.  Tr. 85:17.

15.    When the Territory Manager reports through Connect, he ordinarily records his observations relating to pricing, product placement, signage and product availability, for each location he has visited.  Tr. 82:16-25.

16.    Because this information is of great importance to RJRT's marketing department, utilization of RJRT's Connect Reporting system is an essential aspect of the Territory Manager's job performance.  Tr. 83:3-4, 110:5, 136:7-11.

17.    To ensure that the Territory Manager's observations are as accurate as humanly possible, RJRT policy recommends that observations be entered into the Connect system during the Territory Manager's visit.  Tr. 143:4-5, Ex. 3.

18.    The information Territory Managers input into Connect is later reviewed by supervisors.  Tr. 84:4.

19.    All sales call activity data entered into the Connect system is time-stamped in local time – in Plaintiff's case, Pacific time.  Ex. 42.

20.    Plaintiff Loratious Presley ("Presley" or "Plaintiff') was trained in the use of the Connect system in approximately 2003-2004, and by 2010 he was very familiar with the system.  Tr. 109:19, 109:22.

21.    Presley was trained on the importance of Connect data accuracy.  Tr. 90:3-4.

22.    Presley does not dispute the importance that Connect data be as accurate as possible.  Tr. 110:5, 111:7-9.

23.    Presley understood that RJRT viewed Connect data integrity as a key responsibility of territory management.  Tr. 115:6.

### 3.   Authority of Territory Managers

24.   If a customer were not in compliance with its obligations to RJRT with respect to signage, pricing, product placement and the like, a Territory Manager would note it and had a number of possible actions he can take.  Tr. 85:4-14.

25.   These include:  giving the customer an oral or written warning; taking away money paid for placing a particular display in specified locations; reducing discounts offered to the customer; and cancelling the contract.  *Id.*

26.   In short, the Territory Manager wields substantial power in the area he services.  Tr. 107:21.

### 4.   "Work With" Events

27.   Although Territory Managers normally perform their duties alone, the Senior Division Manager will, from time to time, announce that he will meet the Territory Manager in the field to review the calls the Territory Manager has made. RJRT refers to these events as "work withs."  Tr. 108:12-13.

28.   This case involves Presley's misconduct in connection with a "work with" with his Senior Division Manager, Bradigan.

29.   A "work with" is self-defining – the Senior Division Manager and the Territory Manager go into the workplace together for a training and evaluation opportunity.  Tr. 76:22-77:7.

30.   The "work with" provides the Senior Division Manager with an opportunity to observe his Territory Manager's practices both to help him improve and, if the Territory Manager has developed practices or techniques that might be useful company-wide, to acquire that information and pass it along to others.  Tr. 72:22, 259:15-17.

### 5.   Loratious Presley

31.   RJRT hired Presley in 1992 as a Territory Manager, which is, and was

DEFENDANT'S <u>AMENDED</u> [PROPOSED]
FINDINGS OF FACT AND CONCLUSIONS OF
LAW

during the relevant time period, an at-will position within the company.[3]  Tr. 74:3, 107:5, 107:8, 117:17-18, Ex. 43.

32.     Presley worked in the Southern California region which, in 2010, was managed by Mr. Bill Roth ("Roth"), Senior Director, Trade Marketing. Presley's territory was substantial – between 200 and 300 retail outlets – all within Los Angeles County.  Tr. 74:22-23, 257:15, 257:23.

33.     Presley had worked his most recent territory for over two years prior to his termination.  Tr. 75:4.

34.     During that period, Presley typically worked in the field during the usual 8:00 a.m. to 5:00 p.m. work day.  Tr. 75:19, 75:22; Bradigan Tr. 87:9.

35.     However, on some occasions, his workday varied from that schedule to allow more opportunity to interact with his customers.  Tr. 76:9.

36.     To ensure that his visits gave him a true picture of his customer's compliance with its obligations to RJRT, Presley did not have a set schedule for visiting his customers.  Tr. 75:6, 75:9.

37.     At the time of Presley's termination, his Senior Division Manager was Bradigan.  Tr. 75:11.

38.     Bradigan had worked as a Territory Manager starting in 2008, and was promoted to Senior Division Manager in June 2010.  Bradigan Tr. 19:9, 43:13.

39.     As noted above, the Senior Division Manager is expected to periodically conduct a "work with" with each Territory Manager.  Tr. 108:12-13.

40.     By all accounts, Presley performed well as an RJRT employee.  Tr. 76:12-13, 76:17, 76:20, 108:12-13, 262:5.

41.     Plaintiff had no history of performance problems, and received consistently favorable performance reviews.  Tr. 76:12.

_____

[3]  The title was different in 1992, but the duties were unchanged over the entire period of employment.  Tr. 107:12-14.

42. He was well- regarded by Mr. Roth who had worked with Mr. Presley from 1999 to 2010.[4]  Tr. 261:17, 262:5.

**B.     Company Disciplinary Policies**

43. Applicable RJRT policies and practices are set forth in its "Trade Marketing Employee Handbook," which is provided to each employee when hired. Ex. 8.

44. The handbook contains general information regarding an employee's duties and responsibilities, a detailed discussion of workplace practices, and cross-references the company's code of conduct. *Id.*

45. The handbook contains RJRT's policies regarding how employees are expected to conduct themselves in the workplace. *Id.* at 73.

46. It is RJRT's expectation that all employees treat each other with respect and act in an appropriate manner at all times. Tr. 233:9-13.

47. RJRT expects its employees to conduct themselves with integrity at all times, and to be trustworthy and honest in their dealings in the workplace. Tr. 233:17, 233:20.

48. The handbook also includes a description of RJRT's corrective action policy. Tr. 234:9, Ex. 8 at 75, et seq.

49. The corrective action policy contains a section that lists "reasons for immediate termination." Tr. 234:16, Ex. 8 at 78.

50. Those reasons include:  E. Gross misrepresentation of information as it relates to business practices;  F. Material falsification of work, reports or information; and G. Reporting retail calls contacted that the employee either did not

---

[4] Mr. Roth's testimony on this point is not surprising.  Mr. Presley made a very good impression during the trial. He appeared knowledgeable about his job duties and his customer base, presented a professional demeanor, and was very well-spoken. The Court accepts that Presley performed well and was generally well-regarded among RJRT marketing managers prior to the events giving rise to this case.

DEFENDANT'S <u>AMENDED</u> [PROPOSED]
FINDINGS OF FACT AND CONCLUSIONS OF
LAW

physically contact or did not perform any of their assigned job accountabilities.  *Id.*

51.    The record reflects that Presley received a copy of the handbook on November 8, 2006.  Ex. 21, Bates 643-44.

52.    Presley understood that one of RJRT's policies while he was employed, was that some actions could result in immediate termination.  Tr. 119:22.

53.    Presley understood that material falsification of work, reports, or information was a basis for immediate termination.  Tr. 120:1.

54.    Presley also understood that reporting retail calls an employee has not physically contacted was a basis for immediate termination.  Tr. 120:17-20.

55.    Mr. Charles Watson ("Watson"), who is himself African-American, and a Director within Workplace Practices[5], explained that RJRT's approach with regards to the enforcement of these policies, is to ensure consistent application in all cases.  Tr. 223:15, 227:14.

56.    To accomplish consistency in the application of policy, he explained that he becomes involved in every termination to ensure consistency and uniform application of the company's policies and practices.  Tr. 227:7, 227:14.

57.    He noted that Senior Division Managers do not have unilateral authority to terminate an employee; every termination goes through Workplace Practices review.  Tr. 228:12, 228:15.

58.    Mr. Watson testified that the company consistently terminates employees who provide false or misleading information to their supervisors, or in a report.  Tr. 244:18.

59.    Where his review establishes that the employee has in fact engaged in acts of dishonesty, which historically represents about 10 to 15 cases a year, the

---

[5]  The Workplace Practices group is part of the human resources function within RJRT.  Tr. 223:3.

employee is consistently terminated.  Tr. 244:3-4, 244:18, .

C.    **The Events of August 20, 2010**

60.    On August 20, 2010, sometime between 11:00 a.m. and 1:00 p.m. Bradigan attempted to reach Presley to arrange a "work with."  Tr. 77:15-17.

61.    After Bradigan contacted him, Presley entered data in Connect for visits to customers he purportedly made earlier that day.  Tr. 81:12.

62.    Bradigan and Presley describe radically different versions of those events, which requires the Court to resolve the credibility conflict raised by these differing versions of the key events.

63.    For the reasons that follow, the Court concludes that the evidence presented at trial thoroughly impeached Presley's version of the key events.

64.    The Court first sets forth what it finds to have happened on August 20, 2010, and thereafter addresses the reasons for its credibility determination.

1.    **What Occurred**

65.    At roughly mid-day on August 20, 2010, Bradigan attempted to contact Presley to arrange a "work with" during the afternoon.  Tr. 77:15-17; Bradigan Tr. 65:12-13.

66.    Presley, who had not been in the field that morning, and now concedes that fact, responded and learned that Bradigan wanted to accompany him in the field that afternoon.  Tr. 78:15-79:3, 77:15-17.

67.    This conversation occurred shortly before 12:30 p.m.  Tr. 77:15-17.

68.    After Bradigan contacted Presley, Presley entered data into Connect that reflected that he had visited customers earlier that day.  Tr. 81:5-6, 81:12.

69.    Specifically, between 12:41 p.m. and 12:56 p.m., Presley entered data for seven visits that were purportedly conducted on the morning of August 20.  Ex. 42.

/ / /

70.     When Bradigan and Presley met, they reviewed the data entered into Connect, and Bradigan asked Plaintiff to revisit the locations that Presley had entered into Connect as having been visited earlier that day.  Tr. 91:7-16, 183:6-22; Bradigan Tr. 69:16-25.

71.     Presley did not disclose to Bradigan that he had made no visits earlier that day, nor did he indicate that he had visited those stores the night before.  Tr. 193:13-16; Bradigan Tr. 71:7-14, 76:7.

72.     Instead, Presley and Bradigan proceeded to the locations that Presley had supposedly visited without any indication from Presley that the visits had not taken place.  Tr. 91:7-16; Bradigan Tr. 76:22-23.

73.     Bradigan became suspicious of the veracity of the Connect data because, during the first two visits, Bradigan observed that the conditions of the retail locations, notably product availability, did not appear to match the conditions that Presley reported observing earlier that day.  Tr. 183:24-184:3; Bradigan Tr. 106:24-107:6.

74.     Bradigan and Presley then visited Rite Aid store 05423, another store that Presley reported having visited that morning.  Tr. 184:4-5; Tr. 76:17, Ex. 42.

75.     Shortly after they arrived at the store, Bradigan and Presley were separated; Bradigan noted again that the condition of the store differed significantly from the information reported by Presley in Connect.  Tr. 184:5-14; Bradigan Tr. 102:12-16, 103:24-104:7.

76.     Mr. Eddy Cuellar ("Cuellar") was the Store Manager of Rite Aid store 05423 at the time.  Tr. 24:1.

77.     Presley went over to Cuellar's office, and as soon as Cuellar opened the door for Presley, Presley asked Cuellar to lie to Bradigan and say that Presley had visited Rite Aid store 05423 that morning, though he had not.  Tr. 36:23.

/ / /

DEFENDANT'S <u>AMENDED</u> [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

78. Bradigan was a some distance away when Presley asked Cuellar to lie. Tr. 57:25.

79. Later, Bradigan approached Cuellar, and asked whether Presley had in fact been in the store earlier that day.  Bradigan Tr. 113:9-22.

80. Cuellar advised Bradigan that, although he (Cuellar) had been in the store the entire day, he had not seen Presley.  Tr. 57:1; 57:4, 59:15; Bradigan Tr. 116:8.

81. Cuellar then reported that Presley had asked him (Cuellar) to lie to Bradigan – to tell Bradigan that Presley had been in the Rite Aid store earlier that day, if Bradigan asked.  Tr. 57:18-21, 59:9-12; Bradigan Tr. 113:9-22.

82. Bradigan then asked if there was a way to verify that Presley did not visit the store that morning.  Tr. 60:5-7.

83. Cuellar agreed to permit Bradigan to review video surveillance footage from that morning for purposes of verification.  Tr. 60:9.

84. Bradigan then viewed surveillance video and determined that it corroborated Cuellar, and confirmed that Presley had not been at the store that day.[6] Tr. 60:9; Bradigan Tr. 116:2-5.

85. Presley at first acknowledged that he had not visited these locations, but then changed his story to claim that he had visited them the prior evening.  Tr. 185:11-186:1; Bradigan Tr. 61:21-62:2, 78:14.

86. Presley asserted that, although he entered his report regarding the visits on August 20, 2010, he actually visited the stores on August 19, 2010, but could not enter the data on August 19 because he could not access Connect due to computer problems.  Tr. 80:22-23; 87:24-88:3; Bradigan Tr. 61:21-62:2; 64:12-14.

/ / /

---

[6]  Bradigan visited another customer on the Connect list – Griff Liquor – and determined through a review of video surveillance data that Presley had not visited Griff Liquor that morning either.  Bradigan Tr. 86:18.

DEFENDANT'S AMENDED [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

### 2.     Presley's Credibility

87.     Presley contends that he visited the stores that are reflected in the Connect system as having been visited on August 20, 2010, on the evening of August 19, 2010.  Tr. 80:22-23.

88.     He contends that these visits were entered on August 20 because of computer problems on August 19 that precluded him from entering the data.  Tr. 87:24-88:3.

89.     He denies claiming that he visited these stores on August 20, and he generally attacks the credibility of both Bradigan and Cuellar.  Tr. 91:18.

90.     The Court has carefully considered Plaintiff's arguments in support of his version of events and finds that they are not credible.

91.     The Court notes the following:  (1) Cuellar's Credibility.  Cuellar is a third party witness who has no stake in the outcome of this case, and who the Court found particularly credible.

92.     Cuellar promptly notified Bradigan on August 20, 2010, that Presley had asked him to lie about having visited earlier that day.  Tr. 59:9-12; Bradigan Tr. 113:9-22.

93.     Cuellar also told Bradigan that he (Cuellar) had not seen Presley in the store that morning.  Tr. 59:15.

94.     He has never wavered on those crucial points.  Tr. 39:14-15, 39:17, 59:9-12, 63:16.

95.     Cuellar explained that when Presley asked him (Cuellar) to lie, Cuellar became concerned about his own job security, because he felt that this was about integrity, and he always wanted to do the right thing.  Tr. 58:14-15.

96.     Cuellar was not going to lie on behalf of Presley.  Tr. 65:13.

97.     Nevertheless, Presley argued that Cuellar was motivated to make up lies about Presley.

DEFENDANT'S AMENDED [PROPOSED]
FINDINGS OF FACT AND CONCLUSIONS OF
LAW

98.     That argument finds no support in the evidentiary record.

99.     On the contrary, the record indicates that Cuellar had no personal relationship with either Presley or Bradigan, and that, but for being asked to lie for Presley, he harbored no ill will toward him.  Tr. 23:1, 23:12, 57:8; Bradigan Tr. 100:2.

100.    In addition, prior to the incidents of August 20, 2010, Cuellar had no problems with Presley when Presley made his visits.  Tr. 35:5.

101.    Likewise, the record showed no special relationship between Cuellar, on the one hand, and RJRT and its managers, on the other.  Bradigan Tr. 100:2.

102.    Nor did Cuellar have decision-making authority over the relationship between RJRT and Rite Aid.  Tr. 64:11.

103.    There was simply no evidence of any motive on Cuellar's part to make a false claim to RJRT about statements made by Presley.

104.    Likewise, there is no evidence from which one could conclude that the business relationship between Cuellar's Rite Aid store and RJRT would motivate Cuellar to favor RJRT in this litigation.[7]  Tr. 64:11.

105.    For example, the record contains no evidence regarding the volume of business done with RJRT either in absolute terms or as a percentage of the sales volume of Rite Aid store 05423.[8]

---

[7]  Indeed, Cuellar no longer works for Rite Aid and stopped working for Rite Aid in approximately July of 2013.  Tr. 24:3, 24:5.

[8]  To be sure, Presley attempted to impeach Cuellar by pointing out minor testimonial discrepancies that are common when a witness testifies four years after the event. For example, Cuellar could not recall exactly when he first signed a declaration setting forth his knowledge regarding the events in this case. After lengthy and largely pointless examination, his confusion appeared to stem from the fact that he had spoken with RJRT representatives shortly after the event, but did not execute a declaration until many months later. Another example: Cuellar could not recall how long Bradigan and Presley were in his store even though in deposition some years earlier he had testified that they were there for five to ten minutes. A third example: Cuellar had forgotten that Bradigan reviewed surveillance video when he testified in his deposition but recalled it later when it was mentioned. In the Court's experience, these sorts of discrepancies are common and do not indicate dishonesty or fabrication. On the critical issues – that Presley

DEFENDANT'S <u>AMENDED</u> [PROPOSED]
FINDINGS OF FACT AND CONCLUSIONS OF
LAW

106.   In short, there is nothing in the record to suggest that Cuellar had any motive to lie.

107.   (2) <u>The Connect Report</u>.  Plaintiff contends that he entered data from August 19 into Connect on August 20 because his computer was not working on August 19.  Tr. 87:24-88:3.

108.   The report, Exhibit 42, indicates otherwise.  Ex. 42.

109.   Exhibit 42 reflects that, starting at around 8:30 p.m. on August 19, a time that is consistent with his practice of entering data in the Connect system, Presley entered data regarding visits to 12 different customers who he visited that day.  Ex. 42.

110.   Whether or not the system was working earlier on the 19th is therefore beside the point.

111.   Later that evening, when Presley was entering data from his customer calls, the system was up and running.  Tr. 138:21-139:1, Ex. 42.

112.   Thus, had he visited stores on the evening of the 19th, he could have entered data regarding those calls into the Connect system.

113.   (3) <u>Timing of Entries</u>.  The timing of the entries tends to show that they were made for the purpose of misleading Bradigan into believing that Presley had been in the field earlier on August 20.  Ex. 42.

114.   The record shows that Bradigan called Presley just before 12:30 p.m. to announce that he wanted to do a "work with" with Presley that afternoon.  Tr. 77:15-17.

115.   After that telephone call, Presley began to enter data into the Connect system at 12:41 p.m. and finished his seventh entry at 12:56 p.m., not long before

_____

(continued…)

did not come into the store on the morning of August 20 and that Presley asked him to cover up that fact with Bradigan – there was no material change in Cuellar's testimony.  Tr. 59:9-12, 63:16.

DEFENDANT'S <u>AMENDED</u> [PROPOSED]
FINDINGS OF FACT AND CONCLUSIONS OF
LAW

he met Bradigan.  Tr. 81:12, Ex. 42.

116.    Moreover, the Court reviewed the entries on the Connect report and, of the hundreds of line items recording visits to customers, the Court could find only one entry at a similar time of the day.  Ex. 42.

117.    Every other report reviewed by the Court was entered in late afternoon at the earliest, and most were entered on or after 6:00 p.m.  Ex. 42.

118.    Thus, the timing of the August 20, 2010 entries stands out in part because it was completely inconsistent with Presley's practice, and in part because the evidence gives rise to a strong inference that the data was entered in response to Bradigan's telephone call.

119.    (4) <u>Content of Entries</u>.  Bradigan immediately observed that, at each of the first three stops, the condition of the store did not reflect the condition reported in Connect, particularly with respect to product availability.  Bradigan Tr. 106:24-107:6.

120.    It appears that this discrepancy motivated him to question Cuellar about Presley's purported visit.

121.    Presley argues that conditions change quickly in the stores and testified, without giving a single specific example, that he had seen conditions in stores change shortly after his visit.  Tr. 84:8-11, 84:17.

122.    This, he said, was very common.  *Id.*

123.    First, the Court notes that this testimony is extremely general and does not include a single, specific example.  *Id.*

124.    Second, despite Presley's testimony that he has observed such changes over short periods of time, the Court again surveyed Exhibit 42 in an attempt to find specific examples where Presley visited the same customer at different times on one day, or on consecutive days.  Ex. 42.

/ / /

DEFENDANT'S <u>AMENDED</u> [PROPOSED]
FINDINGS OF FACT AND CONCLUSIONS OF
LAW

125.   The Court could find no examples where that occurred.  Ex. 42.

126.   Thus, in the absence of specific testimony from Presley, in the absence of entries in Exhibit 42 showing an immediate re-visit, and in view of the extremely brief interval between the purported initial visit on the morning of August 20 (or even the evening of August 19) and the second visit with Bradigan, the discrepancy between the Connect report and the conditions observed at the customer premises undermines the credibility of Presley's claim to have recently visited these retail customers.

127.   (5) <u>Working At Home</u>.  Presley now concedes that he worked at home on the morning of August 20, 2010, but the only reasonable interpretation of the overall record is that Presley did not so advise Bradigan.  Tr. 78:15-79:3; Bradigan Tr. 60:16-65:6, 71:2-3, 71:7-14.

128.   Had he immediately informed Bradigan that he had been dealing with administrative matters earlier that day, the events of the afternoon would have proceeded in an entirely different way.  Bradigan Tr. 73:12-15.

129.   Thus, the only plausible reading of the record as a whole, supports the conclusion that Presley did not inform Bradigan that he had not visited customers that morning until Bradigan confronted him on the subject.  Bradigan Tr. 60:16-65:6, 71:2-3, 76:13, 80:6-82:4, 81:12.

### 3.   Summary

130.   To summarize, the Court finds that:  (1) Presley did not visit any customers on the morning of August 20, 2010, before Bradigan called him; (2) Presley entered data into the Connect system to create the false impression that he did visit customers earlier on the morning of August 20, 2010; (3) Presley's data included false statements regarding observations made at the customer locations, because he had not visited those locations prior to the entry of the data; (4) When Presley met Bradigan, he did not advise him that he had worked at home earlier that

day and falsely advised that he had conducted customer visits; and (5) Presley attempted to involve a customer, Cuellar, the store manager at Rite Aid Store 05423, in his effort to deceive Bradigan, by asking Cuellar to tell Bradigan that Presley had visited the Rite Aid store that morning when, in fact, Presley had conducted no such visit.

**D.   The Termination**

131.   Bradigan reported the events of August 20 to his manager, based on what appeared to be an alarming breach of company policy: (1) Presley's falsification of data entered into the Connect system; (2) Presley's making of false statements to Bradigan indicating that he had made visits to customers on August 20, 2010; and (3) Presley's involvement of an RJRT customer by asking Cuellar to lie and falsely corroborate other false statements made by Presley to Bradigan. Bradigan Tr. 127:7-8.

132.   The issue of Presley's misconduct and appropriate corrective action was thoroughly discussed and reviewed within the Trade Marketing chain of command, and with high level managers in the Workplace Practices department. Tr. 181:20, 181:22-25, 182:12-183:4.

133.   On August 25, 2010, a conference was held between Bradigan, Roman and Roth.  Tr. 182:4-5, 182:7.

134.   Bradigan, Roman and Roth discussed what Bradigan had observed during the August 20 work-with with Presley.  Bradigan explained what happened during the work-with from beginning to end.  Tr. 182:12-183:4.

135.   Bradigan stated that when he met Presley, he told Presley the objective was to visit the stores that Presley reported as being visited that day.  Tr. 183:6-22.

136.   Bradigan indicated there were inconsistencies reported in Connect in relation to the first two locations he and Presley visited.  Bradigan also explained what happened at the Rite Aid, and specifically that Cuellar reported to Bradigan

that Presley asked Cuellar to lie on his behalf.  Tr. 183:24-186:5

137.   Roman asked Bradigan to provide Workplace Practices with a summary of what Bradigan had observed, previous "work with" reports, and any other supporting documentation that Bradigan felt was relevant.  Tr. 186:8-11.

138.   Bradigan sent Roman the documents, and Roman reviewed them in accordance with RJRT's established processes for corrective actions.  Roman also communicated with his Workplace Practices peers to ensure consistency in the application of policies.  At some point, Roman also reviewed the case with his director, Watson.  Roman and Watson discussed what documentation Roman had, what information Roman had gathered, what the relevant policies prescribed under the circumstances, and how the policies applied to the specific case.  Tr. 186:20-187:7, 237:9-12, 238:10-18.

139.   Roman and Watson concluded that Presley's misconduct warranted termination, consistent with RJRT policies.  Tr. 187:10-15.

140.   The fact that Presley asked Cuellar to lie on his behalf was very significant, because Presley involved a customer in his transgression.  Tr. 187:18-188:6.

141.   The fact that Presley had misreported information in Connect was also significant, given that RJRT trusts its Territory Managers to truthfully report their whereabouts, and the Trade Marketing Handbook expressly states that falsification of reports is grounds for immediate termination.  *Id.*, Tr. 188:19-189:9, Ex. 8 at 75-79.

142.   Eventually, a decision was made that Presley had engaged in serious misconduct, that pursuant to RJRT policy, the misconduct subjected Presley to potential termination, and that termination of employment was appropriate and consistent with RJRT's handling of similar cases involving dishonesty.  Tr. 187:10-15, 244:1-, 244:3-4, 244:18.

143.   Watson, Roman, Bradigan and Roth participated in the decision to terminate Presley's employment.  Tr. 241:8.

144.   The termination decision was not made until Watson approved it.  Tr. 239:14.[9]

## II.    CONCLUSIONS OF LAW

145.   The legal principles that apply in this case are well-established and not particularly complicated.

146.   The Court will only briefly discuss them and their application in this case.

147.   As the record indicates, Presley was an at-will employee with RJR. Tr. 117:17-18, Ex. 43.

148.   California law provides that "[a]n at-will employment may be ended by either party 'at any time without cause,' for any or no reason, and subject to no procedure except the statutory requirement of notice."  *Guz v. Bechtel Nat. Inc.*, 24 Cal.4th 317, 335 (2000) *citing, e.g., Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 680 (1988); *Gantt v. Sentry Insurance*, 1 Cal.4th 1083, 1094 (1992).

149.   There is, however, a public policy exception to the at-will employment doctrine.  *Green v. Ralee Engineering Co.*, 19 Cal.4th 66, 71 (1998); *Gantt*, 1 Cal.4th at 1089-90.

150.   That doctrine precludes any employee from being terminated where race is at least a substantial motivating factor.

151.   Presley claims that his termination was racially motivated and brings two claims that essentially raise the same issue:  (1) termination in violation of the California Fair Housing and Employment Act ("FEHA"), Cal. Govt. Code §

---

[9]   RJRT has protocols in place for employees that do not agree with corrective action decisions; they can file appeals, and/or lodge ethics complaints. Tr. 249:13-16.  If RJRT finds that an employee has discriminated against another, RJRT takes action against the discriminating employee.  *Id.*

12940(a); and (2) wrongful termination in violation of public policy – racial discrimination.

152.   Both claims require proof that RJRT was Presley's employer, that Presley was an employee, and that Presley suffered an adverse employment action that caused him harm.  *See* CACI, Civil Jury Instructions Nos. 2500 and 2430; see also Ninth Circuit Manual of Model Jury Instructions (Civil), Instruction Nos. 10.1A –10.1C.)

153.   There is no real dispute that RJRT terminated Presley's employment. Ex. 22.

154.   Likewise, there is no dispute that Presley was a member of a protected class.

155.   The only element in issue, which is common to both claims, is whether Presley's race was "a substantial motivating reason for the discharge."

156.   Assuming for purposes of discussion that Presley has presented enough evidence to establish a prima facie case of discrimination, the record demonstrates that RJRT has shown a legitimate, non-discriminatory reason for terminating Presley – that he engaged in the kind of misconduct that its manual warns is cause for immediate termination.

157.   The Court must therefore review the record to determine whether there is specific and substantial evidence that would tend to show that the reason given was pretextual.  *Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 658-59 (9th Cir. 2002); *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1331 (9th Cir. 1998).

158.   On that issue, and indeed on the ultimate question of whether the termination was motivated by racial animus, Plaintiff bears the ultimate burden. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *Aragon*, 292 F.3d at 659.

159.   Here Plaintiff has not met his burden.

160.   The Court notes the following:  (1) Plaintiff presented no direct evidence of racial bias, such as a racially derogatory remark or racial epithets, directed toward him or any other employee by any decision maker or anyone else at RJR.  *Compare Godwin*, 150 F.3d at 1222 ("don't want to have to deal with another female"); *Cordova v. State Farm Ins. Companies*, 124 F.3d 1145, 1149 (9th Cir. 1997) (references to "dumb Mexican");

161.   (2) Plaintiff argued that his termination was the result of racial stereotyping but offered no evidence of any statements, comments, actions or policies that even hinted at racial stereotyping.  *Compare Lindahl v. Air France*, 930 F.2d 1434, 1439 (9th Cir. 1991) (references to female candidate tending to get nervous, easily upset, and lose control as contrasted with male candidates).  Instead of presenting evidence of stereotyping to support his discrimination claim, Presley inferred stereotyping from the termination itself as a basis for finding in his favor.  That turns the issue of discrimination on its head.  To reiterate, Presley cannot argue discrimination from the fact of termination; he must prove that the termination was the result of racial animus with evidence, independent of the termination, that racial animus was a motivating factor for the termination;

162.   (3) Plaintiff offers no evidence of any disparate treatment of non-minorities who engaged in similar misconduct.  *See Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006) (employees must be similarly situated in all material respects to support disparate treatment discrimination claim); *see also Aragon*, 292 F.3d at 660.[10]  Defendant, on the other hand, presented the testimony of Watson, the

---

[10]  Plaintiff suggested at trial that he made no effort to present such evidence because the Court barred it in a pre-trial ruling.  This is a grossly misleading argument.  The only pre-trial ruling that could be remotely related to this issue was raised by Defendant who moved in limine to exclude evidence of other racial discrimination claims brought against RJR. Plaintiff did not oppose that motion.

DEFENDANT'S <u>AMENDED</u> [PROPOSED]
FINDINGS OF FACT AND CONCLUSIONS OF
LAW

Director of Workplace Practices, who explained that he becomes involved in every termination to ensure consistency and uniform application of the company's policies and practices.  Tr. 223:6-11, 223:15, 226:16, 226:19-227:3, 227:18, 243:18. Watson's role in the process is to oversee the process itself and to make sure that Workplace Practices managers are reviewing information thoroughly, checking information for content, and applying policies consistently.  Tr. 227:21-228:1. Workplace Practices Managers must consult with Watson before a termination decision can be made.  Tr. 239:14.

163.    Watson noted that Division Managers too do not have unilateral authority to terminate an employee, and that every termination goes through Workplace Practices' review.  Tr.  227:7, 228:12, 241:22.  Division Managers are required to consult with Workplace Practices before a termination decision is made. Tr.  228:15.  That policy is in place to ensure that managers out in the field do not make arbitrary decisions to terminate employees without any oversight.  Tr. 227:9-11, 227:14.

164.    Watson testified that he has encountered an instance wherein Workplace Practices did not agree with a field manager's termination recommendation.  Tr. 228:21.  In that circumstance, it is Workplace Practices that makes the final decision, not the field manager.  Tr. 229:10.

165.    Similarly, it has happened that Watson did not agree with termination recommendations from managers within Workplace Practices.  Tr. 229:23, 230:22. In those instances, RJRT did not proceed with the termination.  Tr. 231:23.

/ / /

---

(continued…)

Given the lack of any opposition, the Court granted the motion.  The Court inferred that Plaintiff failed to oppose the motion because he had no such evidence to offer.

DEFENDANT'S AMENDED [PROPOSED]
FINDINGS OF FACT AND CONCLUSIONS OF
LAW

166.    In other words, Watson makes his own assessment as to whether there is sufficient information to support a termination decision.  Tr. 231:18.

167.    Watson testified that the company consistently terminates employees who provide false or misleading information to their supervisors, or in reports.  Tr. 240:13-14, 244:1, 244:18; and

168.    (4) Plaintiff presented no evidence that RJRT gave inconsistent reasons for his termination and that the ultimate reason given was a subsequent fabrication.  *Godwin*, 150 F.3d at 1222 (shifting explanations may support an inference of discriminatory animus); *Lindahl*, 930 F.2d at 1438 (same).  On the contrary, the record indicates that employee misconduct was the basis for the inquiry into Presley's conduct and his ultimate termination.  Tr. 239:23, 240:1-8.

169.    Despite this dearth of evidence, Plaintiff insists that RJRT's investigation into his alleged misconduct was inadequate and pretextual to conceal an unlawful motive and achieve an illegal result.

170.    However, the evidence established that RJRT proceeded in this case as it had in any number of other similar cases.  Tr. 239:14, 239:16, 243:10, 243:13, 244:1, 244:3-4, 244:18, 246:6-9, 250:5-8, 250:14-15, 250:19.

171.    Bradigan referred the matter to his boss, and his boss directed him to bring in RJRT's Workplace Practices to discuss the matter, and determine how it should be addressed.  Bradigan Tr. 127:25-128:2.

172.    It is true that aspects of Presley's story were not investigated – particularly his claim that he visited the locations in issue on August 19 – but RJRT reasonably concluded that, once it was clear that Presley had lied about several important matters, there was nothing to be gained by expanding the investigation.  This was not an unreasonable conclusion and not one that the Court should second-guess.  *Arteaga v. Brink's, Inc.*, 163 Cal. App. 4th 327, 344 (2008); accord, *Hersant*, 57 Cal. App. 4th at 1005.

173.   Moreover, Presley fails to explain why RJRT, after 18 years, would want to terminate his employment in the absence of actual misconduct.

174.   Presley was well-known to managers involved in the termination decision, and was recognized as a good, long-term employee who had their respect. Tr. 258:20, 262:5.

175.   No one held any animus toward Presley, racial or otherwise.

176.   But once he was caught in serious acts of dishonesty, RJRT concluded that he could no longer be trusted.  Tr. 187:18-188:6, 245:24-246:3, 260:23-261:2.

177.   Given the responsibilities of Territory Managers, RJRT reasonably concluded that it could not tolerate having someone in that position whose integrity was in doubt.  *Id.*

178.   As Watson testified, RJRT receives 10 to 15 reported instances of employee dishonesty each year.  Tr. 244:3-4.

179.   There is no dispute that once RJRT confirms acts of dishonesty, the employees who are found to have engaged in that kind of misconduct are consistently terminated from employment with the company.  Tr. 244:18.

180.   In such circumstances, length of service and prior performance are not taken into account, because they are not considered relevant to the question of the employee's integrity.  Tr. 244:21, 244:24.

181.   Presley was not treated any differently than any other similarly situated RJRT employees.  Tr. 244:1.

/ / /

DEFENDANT'S <u>AMENDED</u> [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW

1    182.   For these reasons, the Court concludes that judgment should be entered

2   in favor of RJRT.

3

4   Dated:        May 27, 2014

5

6                                         By:_____
                                                Gary Allen Feess
7                                         UNITED STATED DISTRICT
                                          JUDGE
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT'S <u>AMENDED</u> [PROPOSED]
FINDINGS OF FACT AND CONCLUSIONS OF
LAW